**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

DEBORAH JEAN JOHNSON,

                Plaintiff,

v.

MICHAEL J. ASTRUE,
*Commissioner of Social Security*,

                Defendant.

Civil No. 10-4676 (RHK/AJB)

**REPORT AND RECOMMENDATION**

---

Lionel H. Peabody, **PEABODY LAW OFFICE**, Post Office Box 10, Duluth, MN 55801-0010, for plaintiff.

Lonnie F. Bryan, **UNITED STATES ATTORNEY'S OFFICE**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for defendant.

---

## INTRODUCTION

Plaintiff Deborah Johnson disputes the unfavorable decision of the Commissioner of Social Security, denying her application for disability insurance benefits.  *See* 42 U.S.C. §§ 416(i), 423.  The matter was referred to this Court, United States Magistrate Judge Arthur J. Boylan, for a Report and Recommendation to the District Court on the parties' cross-motions for summary judgment.  *See* 28 U.S.C. § 636(b)(1); D. Minn. L.R. 72.1.  For the reasons set forth below, this Court recommends that Ms. Johnson's Motion for Summary Judgment (Docket No. 11) be granted in part and denied in part and the government's Motion for Summary Judgment (Docket No. 13) be denied.  This Court recommends the case be remanded for further proceedings consistent with this opinion.

**FACTUAL BACKGROUND**

## I.      PROCEDURAL HISTORY

On August 31, 2006, Ms. Johnson applied for disability insurance benefits, alleging

disability beginning on April 1, 2004.  (Administrative Record at 92-96, Docket No. 6

[hereinafter "AR"].)  Ms. Johnson's application was denied initially and upon reconsideration.

(*Id.* at 45-48.)  Ms. Johnson sought a ruling from an Administrative Law Judge ("ALJ"), who, on

March 4, 2009, also denied benefits on the basis that Ms. Johnson was not disabled within the

meaning of the Social Security Act.  (*Id.* at 8-18); *see* 42 U.S.C. §§ 416(i), 423.  The ALJ's

determination was upheld as a result of the Appeals Council's refusal to review the decision,

making the ALJ's determination final for the purposes of judicial review.  *See* 20 C.F.R. §§

404.967, 404.981.  This Court has jurisdiction to review the decision of the ALJ.  42 U.S.C. §

405(g).

## II.     MS. JOHNSON'S MEDICAL AND WORK HISTORY

Ms. Johnson was last insured for the purpose of Social Security disability benefits on

March 31, 2005.  (AR at 11.)  On this date, Ms. Johnson was 51 years old.  (*Id.* at 22.)  She

became unable to work on April 1, 2004 due to diabetes, severe depression, high blood pressure,

and a left shoulder injury.  (*Id.* at 133.)  Her medical record also shows a history of back injury,

with related sciatica, and a knee injury.  The key areas of dispute in the instant litigation concern

whether the ALJ appropriately addressed whether Ms. Johnson's depression was a severe

impairment at the date last insured and assessed her residual functional capacity ("RFC")

properly as a result.  The ALJ's hypothetical, posed to the vocational expert to determine Ms.

Johnson's RFC, focused primarily on limitations related to her shoulder injury and knee

surgery.[1]  Ms. Johnson's work history includes employment as a housekeeper, cashier, data entry

clerk, medical records clerk, and retail clerk.  (*Id.* at 200.)  She ceased working in October 2003

due to absences related to her medical conditions.  (*Id.* at 700.)

### A.      Ms. Johnson's History of Depression

Ms. Johnson's depression first appears on her medical record in October 7, 2002 when a

counselor suggested, and Ms. Johnson was prescribed, the antidepressant Zoloft.  (*Id.* at 728,

724.)  Ms. Johnson went to the doctor again on October 25, 2002; the clinic noted her chief

complaint as "deep distress, anxiety and grief" related to the recent deaths of her husband and

daughter.[2]  (*Id.* at 675.)  At that visit, the doctor added Xanax to her medication regimen.  (*Id.*)

On November 14, 2002, after Ms. Johnson presented with significant depression, her doctor

discontinued Zoloft and prescribed Celexa.  (*Id.* at 672-73.)  Notes on Ms. Johnson's visits to the

doctor on November 14, 2002, November 19, 2002, December 6, 2002, and December 18, 2002,

all recorded continued trouble with grief and depression.  (*Id.* at 672-73, 670, 667, 663-65.)  At

her December 18, 2002, appointment, Ms. Johnson cried through much of the appointment.  (*Id.*

at 663-65.)  On March 4, 2003, Ms. Johnson's doctor increased the dosage of Celexa due to an

increase in psychosocial stress and depressive symptoms.  (*Id.* at 642.)  On April 22, 2003, and

June 9, 2003, her doctors noted continued depression.  (*Id.* at 627-29, 621-22.)  On August 11,

2003, the doctor changed Ms. Johnson's prescription from Celexa to Lexapro because she was

seeing insufficient improvement in her depression symptoms.  (*Id.* at 619.)  On August 12, 2003,

---

[1] While other health issues are presented in Ms. Johnson's medical history and noted by
the ALJ as severe medical impairments (*see* AR at 13), they did not significantly factor into the
ALJ's hypothetical or into Ms. Johnson's motion for summary judgment.  As a result, this Report
and Recommendation does not detail Ms. Johnson's medical history on her other impairments, in
particular her diabetes and high blood pressure.

[2] Nearly every medical record is consistent in discussing Ms. Johnson's depression as
related to her continued and ongoing grief over the deaths of her husband and daughter.

Ms. Johnson saw a psychotherapist for her depression and the therapist noted she presented on the Global Assessment Functioning scale ("GAF")[3] at "49 with moderate impairment in occupational and social functioning." (*Id.* at 758.) She was also tearful throughout the appointment. (*Id.*) On August 26, 2003, Ms. Johnson's depression medication was changed from Lexapro to trazadone because Lexapro was keeping her up at night and otherwise was ineffective. (*Id.* at 615-18.) At that doctor visit, she was unable to talk about her depression without crying. (*Id.*) On September 5, 2003, Ms. Johnson's doctor noted the trazadone was not as effective as the Lexapro in managing her depression—she was more tearful and sleeping a lot—and so she was represcribed Lexapro. (*Id.* at 613.) On January 28, 2004, Ms. Johnson reported "significant depression symptoms" and was prescribed Nortriptyline to supplement Lexapro. (*Id.* at 218-19.) Ms. Johnson was given Lexapro samples in September 2004 because she ran out of her prescription (*id.* at 741) after losing her job and insurance in October 2003 due to medical absences. (*Id.* at 723, 38.) On February 28, 2005, a doctor noted her depression was "under control" with Lexapro (*id.* at 733), however on July 5, 2005, a doctor changed her depression medication to citalopram. (*Id.* at 729.)

On July 26, 2005 Ms. Johnson began seeing Dr. Powell for all her chronic medical problems. Dr. Powell noted that her "depressive symptoms seemingly are fairly prominent" and

---

[3] The GAF scale is used by psychotherapists to assess the "psychological, social, and occupational" functioning of an individual on the basis of their mental health. *Diagnostic and Statistical Manual of Mental Disorders* at 32 (4th ed. 1994). A score of 100 is considered "superior functioning in a wide range of activities," while a score of 50 indicates "serious symptoms . . . OR any serious impairment in social, occupational, or school functioning . . . ." *Id.*

added Wellbutrin to her Lexapro prescription.[4]  On May 12, 2006, Dr. Powell noted Ms. Johnson was "having increased trouble with depression" and that she felt "a complete lack of energy and wants to sleep all the time." (*Id.* at 310.)  He questioned whether she may have fibromyalgia syndrome. (*Id.*)  He further noted that he believed she should be referred to a psychiatrist because she "has had difficulty battling depression for quite a while." (*Id.*)

On July 13, 2006, Ms. Johnson saw Dr. Colareta, a psychiatrist, who noted her continued and pronounced depression. (*Id.* at 349.)  In particular, Ms. Johnson presented as having no interest in activities, low energy and concentration, low self-esteem, and high feeling of guilt related to the death of her daughter. (*Id.*)  Dr. Colareta discontinued Lexapro, started Ms. Johnson on Cymbalta, and continued her prescription for Wellbutrin. (*Id.*)  He noted her GAF was 50. (*Id.*)  On July 21, 2006, she was again assessed and found to have a GAF of 50. (*Id.* at 338, 353-55.)  On September 5, 2006, Ms. Johnson was seen at the emergency room, and the treating physician noted she was "significantly depressed and that is probably her biggest medical issues [sic] at this point." (*Id.* at 256.)  She was continuously crying upon intake. (*Id.*)  Dr. Powell followed up with her on September 8, 2006 and noted her depression and "severe delusional symptoms." (*Id.* at 304.)  On September 18, 2006, Dr. Colareta discontinued Cymbalta and started Ms. Johnson on Effexor because she was in tears, and had been crying since her last medication change. (*Id.* at 341.)  Ms. Johnson also reported difficulty looking for work and in focusing or concentrating on tasks. (*Id.*)  On September 29, 2006, Dr. Powell again noted depression as Ms. Johnson's primary medical concern and that she was experiencing insomnia. (*Id.* at 303.)

---

[4] Despite the medical record indicating Ms. Johnson had been prescribed citalopram prior to her establishing a relationship with Dr. Powell, there is no notation in Dr. Powell's records of her actually taking citalopram. (*See* AR at 319-20.)

Third-party activity questionnaires filled out on October 1, 2006 noted that Ms. Johnson cried a lot, had to rest frequently, had difficulty concentrating, and was very withdrawn from life. (*Id.* at 121-28.)  Depression was addressed on medical visits on October 3, 10, 23, and 30, 2006, and trazadone was represcribed.  (*Id.* at 445-46, 553, 492-93.)  On November 6, 2006, Dr. Colareta discontinued Effexor and prescribed Prozac.  (*Id.* at 443-44.)  From December 3-6, 2006, Ms. Johnson was hospitalized, in part due to depression, and prescribed Lorazepam.  (*Id.* at 516.)  Ms. Johnson's husband filled out a function report on December 29, 2006, and described her as forgetful, unable to concentrate, and preferring to be alone.  (*Id.* at 164-72.)  In January 2007, Dr. Powell completed the Social Security Physical RFC Questionnaire and noted that her chronic health conditions included depression and that her symptoms, along with her other health problems, would interfere with her ability to work.  (*Id.* at 376-78.)  Dr. Powell stated that up to 75% of the day, Ms. Johnson would experience difficulties with attention and concentration and would be unable to function even part-time in a competitive work setting. (*Id.*)

On January 16, 2007, a non-examining state agency reviewer, analyzing the period from April 1, 2004 to March 31, 2005, opined that Ms. Johnson has no "medically determinable impairment" from the alleged date of onset of her disability (April 1, 2004) to the date last insured (March 31, 2005).  (*Id.* at 388-400.)  This opinion appeared to be based in part on Ms. Johnson's supposed lack of a mental health evaluation or treatment during that time frame.  As a result, the state reviewer evaluated Ms. Johnson's work capabilities based solely on limitations presented by her shoulder and leg injuries.  (*Id.*)  In May 2007, the non-examining state agency reviewer affirmed the previous determination that Ms. Johnson had no mental impairment as of her date last insured.  (*Id.* at 478.)

Ms. Johnson saw Dr. Colareta on January 29 and March 28, 2007 for dysphoria (*id.* at 441-42) and "major depressive disorder." (*Id.* at 579-80.) At the March 28 appointment, Dr. Colareta increased her prescription of Prozac and continued her prescription of trazadone. (*Id.*) Ms. Johnson's disability report appeal dated April 17, 2007 notes short and long term memory loss, an inability to do basic household chores like cooking and cleaning, and a lack of ability to engage in social activities. (*Id.* at 176-83.) In May and June 2007, Dr. Colareta noted that Ms. Johnson was experiencing increased dysphoria, raised her dosage of Prozac, and added Provigil to her medications to assist with her lack of wakefulness and energy. (*Id.* at 578, 577.) Ms. Johnson reported similar symptoms of depression in August and September 2007. (*Id.* at 567, 566.) In October 2007, Dr. Powell noted that depression was still Ms. Johnson's main area of concern. (*Id.* at 553.) Dr. Colareta confirmed this diagnosis and increased Ms. Johnson's dosage of Prozac (*id.* at 576), which seemed to improve her symptoms two weeks later. (*Id.* at 565.)

Although Dr. Powell noted on January 9, 2008 that Ms. Johnson's depression was reasonably well-treated (*id.* at 548-49), a visit to her psychologist on January 28, 2008, found her to be tearful throughout the session, struggling with chronic depression, and presenting with low energy and poor motivation. (*Id.* at 564, 575.) Dr. Colareta added Wellbutrin to her medication regimen. (*Id.* at 575.) During a hospitalization related to high blood sugar, vomiting and diarrhea from January 31 to February 3, 2008, doctors noted her affect was flat, she seemed quite sad, moved slowly, answered questions slowly, and did not seem to care about what was happening around her. (*Id.* at 500-02.) At discharge, her chart noted chronic depression. (*Id.* at 495.)

On February 18, 2008, Dr. Colareta noted continued dysphoria with increased anxiety and that Ms. Johnson had taken herself off of both Prozac and Wellbutrin. (*Id.*at 573.) He

prescribed Cymbalta.  (*Id.*)  On March 5, 2008, Dr. Colareta noted frequent worrying and

tearfulness, and diagnosed anxiety disorder NOS along with major depressive disorder.  (*Id.* at

571-72.)  This diagnosis and medication change was confirmed on June 3, 2008.  (*Id.* at 590,

588.)  On July 11, 2008, Ms. Johnson's endocrinologist noted that severe depression and chronic

pain were interfering with her diabetes management.  (*Id.* at 599-600.)  In September 2008, her

endocrinologist noted that she had been recently hospitalized, in part due to substantial

depression with periodic psychotic episodes, and that the discharge chart stated that "the rigors

of having diabetes and doing what needs to be done to treat that is overwhelming at times."  (*Id.*

at 601-02.)

On July 22, 2009, Dr. Powell wrote that he had been seeing Ms. Johnson since July 2005

and that she had "battled severe depression since that time and for three years prior to that time."

(*Id.* at 204.)

### B.    Ms. Johnson's Shoulder Issues

In April 2002, a nurse practitioner noted that Ms. Johnson had an eight year history of

chronic pain in her left shoulder, despite shoulder reconstruction.  (*Id.* at 225.)  Ms. Johnson

reported that surgery had been recommended for her right shoulder as well, but never performed.

(*Id.*)  Ms. Johnson was seeking pain medication and the nurse practitioner prescribed Darvon and

Nortriptyline.  (*Id.* at 224.)  In May 2002, Ms. Johnson saw an orthopedist for evaluation of her

shoulder pain and associated headaches.  (*Id.* at 292.)  The orthopedist recommended a magnetic

resonance image ("MRI") due to numbness, tendonitis, and bursitis snapping in the left shoulder.

(*Id.*)  The MRI was inconclusive due to the metal still in place from her previous surgery;

therefore, the orthopedist prescribed a cortisone injection and physical therapy ("PT").  (*Id.*)

In June 2002, Ms. Johnson was seen for shoulder pain and weakness and associated

headaches that induced nausea.  (*Id.* at 703-06.)  She was prescribed non-narcotic pain relievers and further PT.  (*Id.*)  On December 18, 2002, Ms. Johnson reported the pain in her shoulders to be unbearable.  (*Id.* at 663.)  On January 23, 2003, Ms. Johnson reported new symptoms in her right shoulder and continuing pain in her left.  (*Id.* at 654-56.)  On April 22, 2003, Ms. Johnson reported increased shoulder pain due to performing a more than usual amount of data entry.  (*Id.* at 627-29.)  She presented with right arm weakness, numbness in her upper left arm, neck pain upon palpation, and weakness when holding her arms laterally.  (*Id.*)  The doctor prescribed Darvocet.  (*Id.*)  By May 2003, the pain in her shoulders and neck caused Ms. Johnson to cry out when she moved her arms, and muscle spasms were present.  (*Id.* at 624-26.)  The doctor prescribed Darvocet and Lortab.  (*Id.*)

On August 26, 2003, Ms. Johnson presented with joint pain in both shoulders.  (*Id.* at 719-20.)  On September 1, 2003, her doctor noted arthritis in her right shoulder that might require surgery if the pain did not improve.  (*Id.* at 614.)  She saw a doctor on September 24 and 27, 2003, complaining of shoulder pain, and was prescribed Robaxin for muscle spasms.  (*Id.* at 609, 607-08.)  Ms. Johnson was seen again on January 22 and 28, 2004 complaining of severe shoulder pain that was excruciating upon physical examination, and was prescribed Darvocet and Nortriptyline.  (*Id.* at 218-19, 766-67, 765-66.)  Ms. Johnson's complaints of shoulder pain were consistent at doctor's appointments in September 2004 (*id.* at 741), January 2005 (*id.* at 736), and February 2005.  (*Id.* at 733.)  When Ms. Johnson first saw Dr. Powell on July 26, 2005, he noted that her self-reported pain level on a scale of 1 to 10 was from 7 to 9, despite taking Vicodin and Flexeril daily for her shoulder pain.  (*Id.* at 319-20.)  Ms. Johnson also presented with left side shoulder weakness and an inability to raise her left arm over her head.  (*Id.*)

On September 7, 2005, Ms. Johnson saw Dr. Hall, and orthopedic surgeon, for evaluation

of her left shoulder and left hand pain.  (*Id.* at 293-94.)  She presented with pain upon palpation and pain-related weakness on resisted rotation and abduction, but otherwise the shoulder had good strength.  (*Id.*)  Dr. Hall thought future surgery to remove the existing hardware should be considered, they discussed trigger finger surgery, and Hall prescribed Lortab for the pain.  (*Id.*)  Ms. Johnson had trigger finger surgery on October 7, 2005 and saw improvement in her finger pain as a result.  (*Id.* at 317-18, 293.)  Her shoulder pain continued, however, and Dr. Powell renewed her prescription for Lortab on October 20, 2005.  (*Id.* at 315-16.)  Ms. Johnson reported problems with shoulder pain at her February 24, 2006 appointment (*id.* at 312); however, at her March 1, 2006 visit, Dr. Powell noted that despite the shoulder pain, surgery was not indicated. (*Id.* at 292.)  By May 12, 2006, Dr. Powell noted that he was "not optimistic for a lot of positive momentum . . . with regards to [Ms. Johnson's] chronic pain."  (*Id.* at 308.)  During a follow-up appointment on September 8, 2006 following Ms. Johnson's emergency room visit on September 5, 2006, for depression and delusion, Dr. Powell noted that she had a significant amount of left shoulder pain and prescribed Percocet.  (*Id.* at 304-05.)  On September 29 and October 23, 2006, Ms. Johnson complained of pain all over.  (*Id.* at 303, 430-31.)  Dr. Powell noted continued problems with chronic pain on November 2, 2006 (*id.* at 428-29) and January 8, 2007.  (*Id.* at 426-27.)

When Dr. Powell completed the Social Security RFC Questionnaire in January 2007, he noted that she could lift less than ten pounds occasionally.  (*Id.* at 379.)  On January 29, 2007, the non-examining state agency reviewer noted that Ms. Johnson's shoulder injury limited her to lifting twenty pounds occasionally, ten pounds frequently, shoulder level reaching with the left arm was possible occasionally, and that her left arm could supplement her right arm function, in part, since she was right handed.  (*Id.* at 404-06.)  On March 20, 2007, Dr. Powell noted chronic

10

left arm pain and continued Ms. Johnson on narcotic analgesics.  (*Id.* at 424-25.)  In May 2007, the non-examining state reviewer affirmed the prior findings regarding Ms. Johnson's physical limitations and that she was capable of a restricted range of work with light exertion.  (*Id.* at 476.)

In October 2007, Ms. Johnson was still presenting with shoulder pain and Dr. Powell refilled her prescription for Percocet.  (*Id.* at 553-54.)  After a week with no improvement, he switched the prescription to a Duragesic patch.  (*Id.* at 551.)  She was still complaining of chronic pain in January 2008 (*id.* at 548) and March 2008.  (*Id.* at 546-47.)  Dr. Powell prescribed Darvon and gave samples of Lyrica.  (*Id.*)  On May 13, 2008, Dr. Powell noted that Ms. Johnson's right shoulder pain was progressive and he refilled her Darvon prescription.  (*Id.* at 594-95.)  On June 26, 2008, Ms. Johnson saw Dr. Powell for right shoulder and arm pain exacerbated by a fall.  (*Id.* at 592-93.)  An x-ray showed no fracture or dislocation.  (*Id.* at 596.)

## C.      Ms. Johnson's Back and Leg Issues

In July 2002, Ms. Johnson had a sudden onset of pain down the back of her left leg and numbness of her foot.  (*Id.* at 683.)  She was prescribed Darvon for the pain and given an MRI.  (*Id.*)  The MRI showed a lumbar protrusion on the left from L5 to S1.  (*Id.* at 679.)  She was prescribed Wygesic for pain.  (*Id.* at 676.)  In October 2002, Ms. Johnson was  again prescribed Darvon for this pain.  (*Id.* at 674-75.)  On December 18, 2002, Ms. Johnson reported sensory changes in her back that the doctor associated with the lumbar bulge.  (*Id.* at 665.)  On September 27, 2003, she saw her doctor reporting pain in her back with sciatica and was prescribed Percocet.  (*Id.* at 607-08.)

When Ms. Johnson first saw Dr. Powell on July 26, 2005, she reported that her leg would give out, causing her to fall.  (*Id.* at 319-20.)  He noted increased pain on December 30, 2005.

(*Id.* at 314.)  An MRI on that same visit showed a protrusion at the L4 to L5 level with an effect of the dorsal sac and traversing nerve root.  (*Id.* at 329.)  It also showed some milder protrusion at L3 to L4.  (*Id.*)  On February 24, 2006, the leg pain and weakness was worsening and Dr. Powell prescribed a fentanyl patch and hydrocodone.  (*Id.* at 312.)  On October 23, 2006, Dr. Powell noted that Ms. Johnson's legs were continuing to give out and he refilled her Percocet prescription.  (*Id.* at 430-31.)

In February 2003, Ms. Johnson had acute right knee pain and was given Lortab.  (*Id.* at 649-50.)  After an MRI, a surgeon diagnosed several conditions requiring surgical repair of the knee.  (*Id.* at 638-39.)  She was seen six weeks after the arthroscopic surgery and presented with both pain and swelling.  (*Id.* at 623-24.)  She was prescribed Lortab.  (*Id.*)  On June 9, 2003, her knee was again assessed and she was prescribed Celebrex and Darvocet for the pain.  (*Id.* at 621-22.)  On June 24, 2003, doctors prescribed electrical stimulation and she showed improvement with the post-surgery pain.  (*Id.* at 620-21.)  On September 12, 2003, Ms. Johnson presented with increased knee pain, aggravated by frequent standing and walking at work.  (*Id.* at 611-12.)  The doctor prescribed Vioxx.  (*Id.*)  By October 23, 2006, an x-ray showed early arthritic change of the knee.  (*Id.* at 533.)

When Dr. Powell completed the Social Security RFC Questionnaire in January 2007, he was unable to precisely note how long she could sit or stand but noted she would need a job that would allow her to alternate between siting, standing, and walking at will.  (*Id.* at 379-80.)  In January 2007, the non-examining state reviewer noted that Ms. Johnson could be on her feet six hours of an eight-hour day.  (*Id.* at 406.)  This finding was reaffirmed by the non-examining state agency reviewer in May 2007.  (*Id.* at 476.)

In June 2007, Dr. Powell noted right knee and left hip pain, which was worse when

weight bearing and with activity, suggesting osteoarthritis. (*Id.* at 555-56.) Osteoarthritis was confirmed by x-ray in both Ms. Johnson's hip and knee. (*Id.* at 528.) In July 2007, an orthopedist noted that her hip pain was secondary to lumbar spinal stenosis. (*Id.* at 485-86.) An x-ray showed significant joint space collapse at the L5 to S1 vertebrae. (*Id.* at 528.) The orthopedist gave Ms. Johnson three Supartz injections for the pain in her right knee, which then showed improvement. (*Id.* at 486, 487, 488.)

An MRI on July 6, 2007 showed that the nerve traversing the spine at L4 to L5 was compressed due to a disc protrusion. (*Id.* at 526-27.) This protrusion was the cause of an increase in the effect on that nerve since the last study of the injury in December 2005. (*Id.*) In October 2007, Dr. Powell discontinued Lortab and prescribed Percocet for the pain in her back and legs as well as her shoulders. (*Id.* at 553.) After a week of no relief, Dr. Powell switched Ms. Johnson to the Duragesic patch. (*Id.* at 551.) On January 9, 2008, Dr. Powell noted that Ms. Johnson continued to suffer from chronic pain in multiple areas of her body, including her legs and back. (*Id.* at 548-49.) He attributed the pain to fibromyalgia syndrome and arthritis. (*Id.*) Dr. Powell reconfirmed this diagnosis on March 3, 2008. (*Id.* at 546-47.) Consistent with her shoulder pain as described above, Dr. Powell prescribed Darvon and Lyrica. (*Id.*)

## III. THE ALJ'S DECISION

On March 4, 2009, the ALJ issued his decision denying Ms. Johnson's application for disability insurance benefits. (AR at 5-20.) The ALJ followed the five-step sequential evaluation set forth in the agency's regulations. *See* 20 C.F.R. § 416.920(a). The Eighth Circuit Court of Appeals has summarized these steps as follows: the ALJ must determine (1) whether the claimant is currently engaged in "substantial gainful activity;" (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental

ability to perform basic work activities;" (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience);" (4) whether the claimant has the residual functional capacity ("RFC") to perform her relevant past work. *Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998). If the ALJ finds that the claimant is unable to perform his or her past relevant work, then the burden is on the ALJ in step 5 "to prove that there are other jobs in the national economy that the claimant can perform." *Id.* at 895.

At the first step of the evaluation process, the ALJ determined that Ms. Johnson was not engaged in substantial gainful employment after her alleged onset date of April 1, 2004. (AR at 13.) At the second step, he determined that Ms. Johnson had several severe impairments through the date last insured, including insulin-dependent diabetes mellitus, hypertension, major depressive disorder, post-surgical repair left shoulder disorder, right knee arthroscopy. (*Id.*) At the third step, the ALJ determined that none of the impairments, nor any combination of impairments, constituted a presumptively disabling impairment as listed in the regulations. (*Id.*) At the fourth step, the ALJ determined that Ms. Johnson's RFC allowed her to perform light work requiring her to lift and carry twenty pounds occasionally and ten pounds frequently, stand and/or walk six hours of an eight hour day, sit six hours of an eight hour day, engage in limited to occasional balancing, stooping, kneeling, crouching or crawling, occasionally reach over her left shoulder, while avoiding vibrating tools, moving machinery, and working at heights. (*Id.* at 14-15.) The ALJ determined that Ms. Johnson was able to perform her past work as a medical records clerk, and therefore was not disabled as understood by the Social Security Act. (*Id.* at 17-18.) Ms. Johnson and the Commissioner moved for summary judgment as to the ALJ's conclusions.

## ANALYSIS

### I.    STANDARD OF REVIEW

Review by this Court is limited to a determination of whether a decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Davidson v. Astrue*, 578 F.3d 838, 841 (8th Cir. 2009).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Brace v. Astrue*, 578 F.3d 882, 884 (8th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  "Substantial evidence on the record as a whole, . . . requires a more scrutinizing analysis."  *Id.* (internal quotation marks omitted).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (noting the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.)  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  *Gavin*, 811 F.2d at 1199.  Therefore, even if Ms. Johnson's impairments support a claim for disability insurance benefits, the Court must affirm if there is substantial evidence to support the ALJ's conclusion to the contrary.  *Flynn v. Chater,* 107 F.3d 617, 620 (8th Cir. 1997).  This Court cannot reverse the Commissioner's decision "merely because substantial evidence exists in the record that would have supported a contrary outcome."  *Young v. Apfel,* 221 F.3d 1065, 1068

(8th Cir. 2000).

Ms. Johnson bears the burden of proving her entitlement to disability benefits.  *See* 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated that he or she cannot perform past work due to a disability, the burden of proof shifts to the Commissioner to show that the claimant can engage in some other substantial gainful activity.  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

## II.   MS. JOHNSON'S RESIDUAL FUNCTIONAL CAPACITY AND THE VOCATIONAL EXPERT HYPOTHETICAL

Ms. Johnson contends that the ALJ's finding on Ms. Johnson's RFC cannot be sustained because the ALJ failed to assign any functional limitations based on the mental impairment of major depressive disorder.  Ms. Johnson further contends that the ALJ's determination at step four is not supported by substantial evidence because the hypothetical submitted to the ALJ did not include the functional limitations caused by Ms. Johnson's major depressive disorder.  (Pl. Mem. 29-33.)

"[A] vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work. . . ."  20 C.F.R. § 404.1560(b)(2).  A hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant.  *Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994).  "A vocational expert's testimony based on a properly phrased hypothetical question constitutes substantial evidence." *Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999) (quotation omitted).  However, "[vocational expert t]estimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision."  *Hinchey v.*

*Shalala*, 29 F.3d 428, 432 (8th Cir. 1994) (citing *Rappoport v. Sullivan*, 942 F.2d 1320, 1323 (8th Cir. 1991)).

The ALJ listed Ms. Johnson's major depressive disorder as a severe impairment.  (AR at 13.)  The ALJ rejected the state examiner's opinion that Ms. Johnson had no medically determinable mental impairment and found that Ms. Johnson had a history of depression.  (*Id.* at 17).  Despite this finding of depression, the ALJ concluded that Ms. Johnson "was able to work in the past with fairly good control over symptoms with the use of an anti-depressant" and therefore no specific restrictions for the RFC were warranted.  (*Id.*)  However, the ALJ also determined at steps 2 and 3 that Ms. Johnson's mental impairments caused mild to moderate difficulties with regard to concentration, persistence, or pace.  (*Id.* at 4.)

"[W]hen an ALJ states that a claimant has impairments of concentration, persistence, or pace, the hypothetical must include those impairments." *Brachtel v. Apfel*, 132 F.3d 417, 421 (8th Cir. 1997) (citing *Newton v. Chater*, 92 F.3d 688, 698 (8th Cir. 1996)).  In *Newton*, the ALJ stated on a Psychiatric Review Technique Form that the claimant "often" had deficiencies of "concentration, persistence or pace." *Newton*, 92 F.3d at 695.  The hypothetical posed to the vocational expert limited the claimant's capabilities to "simple jobs." *Id.*  The court remanded because the hypothetical did not specifically include impairments regarding concentration, persistence, or pace.  *Id.*  In *Brachtel*, the ALJ also noted by checking a box on a Psychiatric Review Technique Form that the claimant "often" had deficiencies of "concentration, persistence or pace."  132 F.3d at 421.  However, the ALJ also wrote in his report that the claimant "demonstrates few concentration deficits and has very good memory."  *Id.*  The court found the hypothetical posed to the vocational expert contained "enough" restrictions because it included the ability "to do only simple routine repetitive work, which does not require close attention to

detail" and to "not work at more than a regular pace." *Id.*

Here, the ALJ stated that Ms. Johnson had mild to moderate difficulties with respect to concentration, persistence, or pace, but provided no corresponding limitations in the hypothetical he posed to the vocational expert. As a result, the vocational expert's testimony was deficient and is not substantial evidence in support of the ALJ's finding. *See Shalala*, 29 F.3d at 432. Accordingly, this Court recommends that the case be remanded so that a vocational expert can render an opinion inclusive of all relevant limitations.

## III.   WEIGHT OF DR. POWELL'S OPINION

Ms. Johnson argues that the ALJ failed to evaluate the opinions of Dr. Powell and that the ALJ should have given controlling weight to Dr. Powell's opinions as her treating physician. Dr. Powell has treated Ms. Johnson since July 2005. (AR 319.) Ms. Johnson's date last insured is March 31, 2005. (*Id.* at 11.) The ALJ acknowledged that Dr. Powell had provided a medical opinion, but stated only that Dr. Powell's opinion is "beyond the relevant period of evaluation." (AR at 17.) It is therefore unclear what, if any, weight the ALJ gave to Dr. Powell's opinion.

Under the current regulations, the ALJ is directed to consider every medical opinion received. 20 C.F.R. § 404.1527(d). Generally, more weight is given to opinions from treating physicians, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . ." *Id.* at 404.1527(d)(2). If the ALJ finds a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, then it will be accorded

controlling weight.  *Id.*  If the ALJ determines that the treating doctor's opinion does not warrant

controlling weight, then the ALJ must consider other factors, including "any factors . . . which

tend to support or contradict the [treating physician's] opinion," to determine the weight to be

given the treating doctor's opinion.  *Id.*  "While the opinion of a treating physician is entitled to

substantial weight, it is not conclusive because the record must be evaluated as a whole.

Moreover, a treating physician's opinion is afforded less deference when the medical evidence in

the record as a whole contradicts the opinion."  *Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir.

2007) (citation and quotation omitted).  The ALJ may give little weight to a treating physician's

opinion if that opinion rests solely on the claimant's complaints and is unsupported by objective

medical evidence.  *Woolf v. Shalala*, 3 F.3d 1210, 1214 (8th Cir. 1993).  Even if the treating

physician's opinion is not given controlling weight, it "should not ordinarily be disregarded."

*See Cunningham v. Apfel*, 222 F.3d 496, 502 (8th Cir. 2000).

Although Dr. Powell did not begin treating Ms. Johnson until after her date last insured,

that fact alone does not end the inquiry.  Evidence of a disability subsequent to the expiration of

one's insured status can be relevant in helping to elucidate a medical condition during the time

for which benefits might be rewarded.  *Phyland v.* Apfel, 149 F.3d 873, 877 (8th Cir. 1998).

Here, Dr. Powell began treating Ms. Johnson only a few months after her date last insured.  He

treated her for chronic conditions that he noted had been ongoing for extended periods upon the

commencement of his treatment relationship with her.  (AR at 319-20.)  For example, Dr. Powell

has stated that Ms. Johnson has "battled severe depression" since three years prior to the time he

began treating her.  (*Id.* at 204.)

In addition, even if the ALJ determined not to accord Dr. Powell's opinion controlling

weight, he was required to consider other facts as set forth in 404.1527(d)(2)(i) and (ii) and

(d)(3) through d(6) to determine the appropriate weight to give to Dr. Powell's opinion.  The

record does not reflect that this analysis took place.  The ALJ should have evaluated Dr. Powell's

opinion to determine whether it was "well-supported by medically acceptable clinical and

laboratory and diagnostic techniques and is not inconsistent with the other substantial evidence

in the record."  *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (alteration and internal

quotation marks omitted) (citing 20 C.F.R. § 404.1527(d)(2)).  Even if the ALJ determines that

little weight is appropriate, Dr. Powell's opinion should not be disregarded.  Therefore, this

Court recommends the case be remanded such that the ALJ can afford Dr. Powell's opinion the

proper weight.

## IV.    DATE OF ONSET OF MS. JOHNSON'S DISABILITY

Ms. Johnson argues that the ALJ failed to comply with Social Security Ruling 83-20

("SSR 83-20") regarding establishing the onset of disability.  SSR 83-20 sets forth guidelines for

determining the onset date of a claimant's disability.  The ruling defines the disability onset date

as "the first day an individual is disabled as defined in the Act and the regulations."  SSR 83-20,

1983 WL 31249 (S.S.A.).  In determining the onset date for disabilities of nontraumatic origin,

the ALJ should consider the applicant's allegations, her work history, and the medical and other

evidence of her condition.  SSR 8320 provides that:

> In some cases, it may be possible, based on the medical evidence to reasonably
> infer that the onset of a disabling impairment(s) occurred some time prior to the
> date of the first recorded medical examination, e.g., the date the claimant stopped
> working. How long the disease may be determined to have existed at a disabling
> level of severity depends on an informed judgment of the facts in the particular
> case. This judgment, however, must have a legitimate medical basis. At the
> hearing, the administrative law judge (ALJ) should call on the services of a
> medical advisor when onset must be inferred.

SSR 83-20.

Ms. Johnson contends that the ALJ found her to be currently disabled, and improperly

determined that her disability did not begin prior to her date last insured without obtaining testimony from a medical expert familiar with the entire record.  (Pl. Mem. 37-38.)  Ms. Johnson's contention that the ALJ found her to be currently disabled is based on an exchange between her and the ALJ during the hearing.  (*Id.*)  Specifically, Ms. Johnson stated: "I just can't keep working," to which the ALJ responded:  "Well, I don't doubt that very much in the later times here.  What I'm really missing is some basis for me to arrive at why it was not possible before March of [2005]."  (AR at 38.)

The Commissioner argues that the ALJ's statement was merely an "off-handed, unclear" comment that does not constitute an actual finding of disability.  The Commissioner further argues that SSR 83-20 is inapplicable because it is relevant only when the ALJ has found the existence of a disability.  According to the Commissioner, the ALJ did not need a medical advisor to determine the onset of disability in this case, because the ALJ determined that Ms. Johnson was not disabled during the time on or before March 31, 2005.

Regardless of whether the ALJ's comments indicate that he found Ms. Johnson to be currently disabled, the Eighth Circuit has rejected the Commissioner's position that SSR83-20 applies only when the ALJ has already made a finding of disability:

> The Commissioner argues that SSR 83-20 applies only for the limited purpose of determining the precise date of onset when the ALJ has already found that a claimant had established her disability and her entitlement to benefits. . . .  We cannot agree with the Commissioner's construction of SSR 83-20.  The introduction to SSR 83-20 explains that the determination of the onset date is critical because "it may affect the period for which the individual can be paid and *may even be determinative of whether the individual is entitled to or eligible for any benefits.*" SSR 83-20. This language plainly indicates the ruling is intended to apply to cases such as [ones lacking a finding of a disability].

*Grebenick v. Chater*, 121 F.3d 1193, 1200 (8th Cir. 1997) (emphasis in original).

Further, in the instant case, the ALJ's comments at the hearing suggest that he may have

determined Ms. Johnson to be disabled if given a proper basis to so find before the date last insured.  Pursuant to SSR 83-20, if the medical evidence regarding onset is ambiguous, the ALJ should obtain an expert opinion from a medical advisor to determine a medically reasonable date of onset.  *See Grebenick*, 121 F.3d at 1200-01; *DeLorme v. Sullivan*, 924 F.2d 841, 848 (9th Cir. 1991) ("In the event that the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83-20 requires the administrative law judge to call upon the services of a medical advisor and to obtain all evidence which is available to make the determination.").  Under the circumstances, a more searching analysis as to the onset of Ms. Johnson's disability was required by SSR 83-20.   As a result, this Court recommends the case be remanded such that the ALJ can determine the onset date of disability, if any, and the effect that may have on the benefit determination.

## V.        THE ALJ'S CREDIBILITY DETERMINATION

Ms. Johnson contends that the ALJ's credibility determination is not supported by substantial evidence and that the ALJ did not consider the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) in assessing credibility.

This Court "defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence."  *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).  "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."  *Holmstrom v. Massanari,* 270 F.3d 715, 721 (8th Cir. 2001).  In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical

evidence to support the claimant's complaints. *Finch v. Astrue,* 547 F.3d 933, 935 (8th Cir. 2008); *Polaski,* 739 F.2d at 1322. "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." *Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir. 2000). The ALJ need not explicitly discuss each factor. *Goff v. Barnhart,* 421 F.3d 785, 791 (8th Cir. 2005). "It is sufficient if he acknowledges and considers [the] factors before discounting a claimant's subjective complaints." *Id.* (quotation omitted). "The inconsistencies between [a claimant's] allegations and the record evidence provide sufficient support for the ALJ's decision to discredit [a claimant's] complaints of pain." *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005).

The ALJ determined that Ms. Johnson's subjective complaints were not consistent with or supported by the objective medical record of treating and examining physicians. (AR at 15.) However, it appears that the ALJ did not consider the opinion of Dr. Powell in finding that Ms. Johnson's complaints were inconsistent with the record. (*See id.* at 17.) Because the Court recommends that the case be remanded for consideration of the appropriate weight to give Dr. Powell's opinion as treating physician, reconsideration of the ALJ's credibility determination also is appropriate. Reconsideration of Dr. Powell's opinion may affect the determination that Ms. Johnson's complaints were not consistent with the record. Therefore, the Court recommends that, on remand, Ms. Johnson's credibility should be assessed in light of the entire record, including the weight placed on Dr. Powell's opinion.

## **RECOMMENDATION**

For the foregoing reasons, **IT IS HEREBY RECOMMENDED THAT:**

1.  Plaintiff's Motion for Summary Judgment [Docket No. 11] be **GRANTED IN PART AND DENIED IN PART;**

2.      Defendant's Motion for Summary Judgment [Docket No. 13] be **DENIED**;

3.      The case be remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further

proceedings consistent with this Recommendation; and

4.      Judgment be entered accordingly.


Dated: December 29, 2011

 s/ Arthur J. Boylan
Chief Magistrate Judge Arthur J. Boylan
United States District Court


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation

by filing with the Clerk of Court, and by serving upon all parties, written objections which

specifically identify the portions of the Report to which objections are made and the bases for

each objection.  This Report and Recommendation does not constitute an order or judgment from

the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.

Written objections must be filed with the Court before    January 12    , 2012.